STATE of Oklahoma ex rel. DEPART-
MENT OF HIGHWAYS of the State of
Oklahoma, and Sooner State Securities,
Inc., Appellees,

v.

Dale Richard MARTIN, Eunice Manspeak-
er, Grace Evelyn Marson, Mary Alice
Rummell, Charles Richard Martin, Viola
Pearl Clark Hutchinson, formerly Viola
Pearl Clark, James Frank Martin, Mil-
dred Waunita McCoy, Berniece Bruton,
Inez Shade, Don F. Weiss, Paul C.
Weiss, Roscoe E. Weiss, Wilford C.
Weiss, Elsie L. Weiss, Ella Louise Perry,
also known as Mary Weiss Perry, Shir-
ley Mae Smeltzer, Charles Richard
Weiss, Ernest Neal Weiss, Lanny David
Weiss, Larry Dean Weiss, Marrilea
Smith, also known as Mary Lee Smith,
W. A. Hay, John Hay, Dan J. Hay, Pete
Hay, Mary Keith, Marjorie Goforth and
Ruth Yarborough, Appellants.

No. 49707.

Court of Appeals of Oklahoma,<br/>Division No. 1.

Nov. 15, 1977.

Released for Publication by Order of<br/>Court of Appeals Dec. 8, 1977.

612

James H. Harrod, C. Max Speegle, Edmond, for appellee Sooner State Securities, Inc.

Rice & West by William O. West, Edmond, for appellants.

ROMANG, Judge:

This action arose out of a curious procedural history. The Defendant-Appellants (Grantors) owned a parcel of real property. The State Department of Highways filed this action in condemnation of a portion of this property for right-of-way purposes on March 22, 1965. Shortly thereafter Sooner State Securities, Inc. (Appellee-Intervenor, Grantee hereafter) entered into negotiations with the Grantors, or their predeces-

sors in interest, for the purchase of the property and the condemnation award. In December, 1965 the Grantee secured separate but identical contracts for the sale of the property from all the owners except one owner (L. F. Brown) whose interest was approximately 1.25% of the total. Among other things the executed contracts provided for the payment of earnest money to the Broker (agent of the Grantors) and a further down payment within 30 days of the final decree in a probate action then pending. A dispute arose over whether securing a contract from all the owners (including L. F. Brown) was a condition to the Grantors' contractual obligation to convey title. After the final decree in the probate action the Grantors refused to perform and the Grantee intervened in the condemnation suit on February 27, 1967 seeking, *inter alia*, specific performance of the contract and the condemnation award still held by the Court Clerk. The Grantors demurred and filed denials.

Procedurally, nothing pertinent happened until July 18, 1974 when the Grantors petitioned the court to substitute parties (some original Grantors had died and their heirs or beneficiaries were to be substituted), quiet their title against the Grantee and disburse the condemnation award. The Grantee answered and filed a counterclaim seeking the same relief as originally sought in its petition to intervene.

The matters between the Grantors and the Grantees were tried by the District Judge without a jury and he entered written findings of fact and conclusions of law on April 26, 1976. In summary, the District Court ordered specific performance of the contracts and disbursed the award to the Grantee. The Grantors appeal.[1]

On appeal, the Grantors contend (1) that the contracts of December, 1965 are void, (2) that the Grantee should be barred by laches from asserting its interests, (3) that the District Court improperly denied the Grantors a jury trial, and (4) that the District Court had no jurisdiction to disburse the condemnation award.

### A. The Contracts

■ It is basic and fundamental in all appeals that the District Court's findings of fact in matters of legal cognizance are entitled to the same deference as a jury verdict and should not be set aside if there is any competent evidence which reasonably tends to support the decision. *Walker v. Duncan*, 469 P.2d 647 (Okl.1970) and *Nikkel v. Stifel, Nicolaus & Co., Inc.*, 542 P.2d 1305 (Okl. 1975). In matters of equitable cognizance the appellate court must examine the record but will only reverse a finding of fact if it is clearly erroneous. *Mayfair Bldg. Co. v. S. & L. Enterprises, Inc.*, 483 P.2d 1137 (Okl.1971).

■ The interpretation of a contract is a question of law for the court where the language used is unambiguous. *Pray v. Kidd Williams Drilling Corp.*, 352 P.2d 380 (Okl.1960). But where the intention of the parties is not clear from the writing and is shown by parol evidence, a question of fact is presented for the trier of fact. *Humphrey v. Timken Carriage Co.*, 12 Okl. 413, 75 P. 528 (1904). Cf. also Restatement of Contracts 2d, Tentative Drafts 1–7, § 238 and comment d.

The validity of the contract was challenged on the ground that two express conditions precedent to the sales contracts were never fulfilled. Each contract provided, in pertinent part, that

> "[i]t is a condition of this sale that [1] the Sooner State Securities, Inc., is licensed to do business in the State of Okla [sic]; [2] that ownership of all of the above described real estate set forth in this contract is absolutely necessary and proper to carry out the business for which said corporation was chartered and licensed . . . .."

**1.**

As to condition [1] the District Court found that

1. It should be noted that the State Department of Highways played no role in the action below with which we are concerned on appeal and has not participated in the appeal.

"[t]he intervenor [Grantee here] was at the time of the execution of the original contract a viable corporation and is, from the evidence, a viable corporation at the present time, ready, willing and capable of fulfilling the terms of the contract." The Grantors do not challenge this finding as far as it goes but argue that the Grantee was not authorized to do business in Oklahoma from April 11, 1968 to December, 1971 due to its failure to pay corporate franchise taxes.

■ Under 68 O.S.1971, § 1203 each corporation is required to annually report and pay a franchise tax for the privilege of doing business in this State. Penalties for failure to do so are provided in 68 O.S.1971, § 1212. Section 1212(a) provides a penalty and that "the Tax Commission *may* enter an order directing the suspension of the charter . . . under which the corporation . . . may be organized, and the forfeiture of all corporate or other rights inuring thereunder." (Emphasis added.) Thus the forfeiture of corporate rights under 1212(a) is not automatic but requires an affirmative act of the Tax Commission. Section 1212(a) provides that "[a]ny corporation . . . whose right to do business shall be *thus forfeited* shall be denied the right to sue or defend in any court of this State . . . Every contract entered into by or on behalf of such corporation . . . *after such forfeiture as provided herein*, is hereby declared to be voidable." (Emphasis added.)

■ Records from the Secretary of State's office indicated that the Grantee had its right to do business suspended on April 11, 1968 and was reinstated on December 20, 1971. During this period it is clear that the Grantee was not entitled to sue or be sued in our courts. But the forfeiture provision of 68 O.S.1971, § 1212(c) only provides that contracts made "after such forfeiture" shall be voidable. It is clear that if there was a contract it was made in December, 1965 or before the forfeiture period. The statute suspends the

present right to do business but does not abrogate past and subsisting contractual relations. Additionally, the section makes such contracts voidable. No act of avoidance is pointed to which would have rendered the contract void.

■ But it is further argued that by letting the right to do business be suspended the Grantee rendered itself incapable of performing the contract. While the incapacity, if any, was temporary, it is a sufficient answer that the modest conditions for reinstatement under 68 O.S.1971, § 1212(f) make it clear that the Grantee was not incapacitated such that the contract was impossible of performance.[2]

## 2.

As to the second condition, i. e. that 100% of the ownership was "absolutely necessary and proper to carry out the business for which said corporation was chartered and licensed . . .", the District Court found

"[the argument] to be without merit. This was not an essential requirement of the agreement between the parties. Moreover, the [Grantee] accepted the executed contract and deeds as submitted, without requiring the signature of L. F. Brown, and agreed to pay the full purchase price as set forth in the contract, to be distributed to all other [Grantors] on a proportionate basis. It was to the detriment of the [Grantee], rather than to the [Grantors], that the signature of L. F. Brown was not obtained."

The Grantors point to record evidence that since the property had been in the family since the run of 1889 that they were individually unwilling to sell their part unless all others did so and that since the Grantee made a later offer which changed the terms of payment, it is clear that the Grantee did not consider the negotiations closed.

■ We express some reservations as to whether the contract was sufficiently ambiguous on this point to even admit parol

**2.** We might note in passing that the Court's development of this problem was little assisted

by the parties' briefs, neither of which even cited the crucial statute.

# 615

evidence of intent. The language used cites the importance of 100% ownership for the business of the Grantee. It clearly reads as a condition designed to secure the Grantee an option to refuse performance if it was unable to secure 100% ownership. As such, it could be waived. In any event, the parol evidence leaves doubts as to whether it was objectively manifested to the Grantee's agents that the Grantors considered it a condition benefiting them. In such a case, we cannot say that the District Court's finding is clearly erroneous or against the clear weight of the evidence.

## B. Laches

■ The principles of the equitable doctrine of laches are easy to state. Generally, laches is available in equity as a defense where the party asserting its rights has delayed in doing so for an unreasonable period of time, with knowledge or on notice of relevant facts, to the detriment of the other party. *Marshall v. Amos*, 442 P.2d 500 (Okl.1968); *Carnes v. Thomas*, 280 P.2d 474 (Okl.1955); and *Larrance Tank Corp. v. Burrough*, 476 P.2d 346 (Okl.1970). But the relevant precedents are of little value since it is also clear that each case must be decided on its own facts and generalities are of little help. *May v. Archer*, 302 P.2d 768 (Okl.1956).

The Grantors' position in this case is that while the action for specific performance, etc. was filed as a part of the Grantee's petition to intervene in February, 1967, it did not press the action until the Grantors sought, *inter alia*, to quiet their title in July, 1974, or a period of 7 years. During this period the Grantors, or their predecessors, received rents, paid taxes and maintained the property. The market value of the property increased significantly and the primary Grantor who negotiated the contracts died.

Our Supreme Court has held that detrimental and unreasonable delay in prosecuting an action may give rise to laches as well as delay in filing an action. *Young v. Kirk*, 292 P.2d 1009 (Okl.1956). And the U. S. Court of Appeals for the Tenth Circuit,

applying Oklahoma law, has held that substantial increase in value of property was a relevant consideration in applying the doctrine of laches. *Lawson v. Haynes*, 170 F.2d 741 (10th Cir. 1949) and *Alexander v. Phillips Petroleum Co.*, 130 F.2d 593 (10th Cir. 1942).

The equitable concept of laches derives from the maxim that equity aids the vigilant. McClintock, Handbook of the Principles of Equity (1948) p. 71. But the principle is not based solely on a desire to avoid delay but rather on the equitable need to avoid delay which results in prejudice.

■ The District Court rejected the defense of laches

"... for the reason that both sides could have and should have caused this matter to be litigated at any time between February 28, 1967 . . . and July 18, 1974 . . . Both sides had interests which needed to be protected in this action and both sides were equally guilty of procrastination in not seeking to have their rights settled by this Court."

On clear principle this conclusion cannot stand. The holder of the legal title in possession of real property has less reason to sue to quiet its title than the grantee under a contract for sale has reason to seek specific performance. It cannot fairly be said that the procrastination of the legal owner (if it is procrastination) is the equitable equal of procrastination by a claimant under a contract for sale.

But while this conclusion cannot stand scrutiny, we are unable to find in the record the kind of prejudice which converts mere delay into the defense of laches. The Grantors conceded that while they bore the burden of taxes and maintenance that they also enjoyed the benefits of rental income which completely offset taxes and expenses. Viewing the contract as a valid agreement, it is clear that the Grantors could have sued under the agreement equally with the Grantee. While the death of the principal negotiator for the Grantors, in some circumstances, would be a sufficient prejudice to trigger laches, we are offered no basis for finding that this was in fact prejudicial.

**616**

Perhaps the Grantors' case on the facts would have been stronger with the decedent's testimony, but as far as we can determine from the parties' arguments and the record, his testimony would have been substantially the same as evidence admitted in the District Court.

The Grantee offers no tenable explanation for its delay. As such, we agree that the delay was unreasonable and that a District Court must examine carefully the possibility of prejudice from such delays. But mere delay is no defense unless the relevant statute of limitations is involved. More than delay is required to upset rights created by a valid contract.

### C. Jury Trial

■ The Grantors incredibly argue that they were entitled to a jury trial because the construction and interpretation of a contract is ordinarily a question of fact to be resolved by the jury. See *Humphrey v. Timken Carriage Co.*, supra. Cases cited by Grantors establish the relative roles of court and jury in legal actions. The Grantors confuse the division of authority where a jury is required with the classical division between actions at law and in equity. We would have thought it was a proposition not needing the citation of authority that parties to actions at common law are entitled to a jury trial while parties to actions in equity are not, were it not for Grantors' brief. The argument of the Grantors is fundamentally and totally wrong. Indeed, the raising of this issue is a frivolous waste of the Court's time. Actions for specific performance of a contract to convey real property and to quiet title are both of an equitable character for which there is no right to a jury trial. *Pickle v. Martin*, 188 Okl. 689, 112 P.2d 1081 (1941) and *Brewer v. Baker*, 283 P.2d 203 (Okl.1955). The denial of a jury trial was proper.

### D. The Condemnation Award

■ There is no merit to Grantors' argument that the court had no jurisdiction to award the condemnation award to the Grantee. It is sufficient that the condemnation award was specifically mentioned by the Grantee's petition in intervention and the Grantors' counterclaim. Since the intervention and quiet title claim were filed as part of the condemnation action, the trial court having jurisdiction over the cause, it also had jurisdiction over the award.

The judgment of the District Court is affirmed.

AFFIRMED.

REYNOLDS, P. J., and BOX, J., concur.